Bechtold, Appellant, v. Coleman Realty Company.

Argued November 15, 1950. Before DREW, C. J., STEARNE, JONES, BELL, LADNER and CHIDSEY, JJ.

rear-
gument refused May 2, 1951.

*Robert T. McCracken,* with him *Harris C. Arnold* and *Arnold, Bricker & Beyer,* for appellants.

*Paul A. Mueller,* with him *Ralph M. Barley,* for appellees.

OPINION BY MR. JUSTICE LADNER, March 28, 1951:

The plaintiffs (appellants) being minority stockholders of the Coleman Realty Company, filed a bill in equity to have adjudged as invalid the repeal by a majority stock vote of certain by-laws of the company which imposed restrictions on the right of stockholders to sell the company's stock. The court below entered a final decree dismissing the bill, and directing plaintiffs to surrender their respective certificates for reissue as required by the repeal resolution. From that decree we have this appeal.

There is little if any dispute in the essential facts and the question resolves itself into one of law. From the fact findings of the court below and the undisputed evidence we gather the following material facts: M. T. Garvin (now deceased) was originally the sole owner

of a large department store business in the City of Lancaster, and of the building in which the business was carried on. In 1916 he incorporated his enterprise under the name of M. T. Garvin & Company: see *Garvin's Estate*, 335 Pa. 542, 6 A. 2d 976 (1939). In the fall of 1930 he incorporated the Coleman Realty Company with a capital of $300,000 divided into six thousand shares of $50.00 each for the purpose of separating the real estate ownership from the mercantile business. After organization of the Coleman Company the title to the real estate occupied by Garvin & Company was. conveyed by that company to the Coleman Company in exchange for all of the (6,000)[1] shares of stock of the latter company. At the organization meeting of the Coleman Company, by-laws were adopted by unanimous vote of the incorporators in which Article VIII, section 4, imposed, inter alia, the following restrictions on the transfer of stock, viz., "Section 4. No stock shall be sold or transferred by any stockholder to any person not already a stockholder until an offer has first been given to the corporation or the remaining stockholders in proportion to their interest in the corporation, to purchase said stock at its book value as appearing on the books of the company, except that stock may be transferred by any stockholder to an employee in recognition of his service and ability in behalf of the corporation."

This provision of the by-laws was also printed on the stock certificates, as directed by section 5 of Article VIII of said by-laws. Two days after the organization meeting, viz., January 2, 1931, M. T. Garvin &

---

[1] In reality 5,998 shares were transferred to Garvin & Co., the other two continued to be held by plaintiffs W. W. Bechtold and A. A. Cauller, who, with M. T. Garvin, were the incorporators of the Coleman Co.

Company distributed 4,000 shares of its 5,998 shares to its shareholders who were also the employees of M. T. Garvin & Company in the nature of a dividend on the Garvin stock made payable in Coleman stock. M. T. Garvin personally received by way of this stock dividend 3280 of the 4,000 shares and immediately purchased the remaining 720 shares from those who had received these shares so that thereafter M. T. Garvin owned individually 4,000 shares of the Coleman Company stock. Until his death Mr. Garvin remained the principal shareholder of both companies and was the president of both. Restrictions in similar language were also imposed upon stock of the Garvin Company: see *Garvin's Estate,* 335 Pa. 542, 6A. 2d 976 (1939).

The reason and importance of these restrictive rights appears by the testimony of the witness, Bechtold, who testified in substance, that if the controlling interest in Coleman Company should get into the hands of perhaps some rival mercantile interests or chain, Garvin & Company might be evicted, the goodwill lost and perhaps the continuance in business rendered impossible. During Mr. Garvin's lifetime, no questions or difficulty arose. He died in 1937 and, by his will, he provided for the acquisition of the Garvin Company stock by the employes of that company: See *Garvin's Estate,* supra, but through some oversight or omission, he made no similar provision for the disposition of 4,000 shares which he held in the Coleman Company. Though these corporations were separate entities, it may be he thought of them as one company. Be that as it may, the executors felt obligated to sell the stock but carefully conformed to the restrictions by first offering it to Garvin & Company (the principal holder apart from Garvin's estate) and to all the other shareholders of the Coleman Company. They were, apparently, unable to purchase so large a block of stock and the

Garvin Estate executors then sold the same to Elizabeth Stauffer Ludgate, now the president of the Coleman Realty Company, and one of the defendants in the bill. The certificate issued to her was subject to and had indorsed thereon the same restriction as appeared on all other stock certificates.

On May 6, 1949, a meeting of the shareholders of Coleman Company was held and sections 3, 4 and 5 of Article VIII of the by-laws which restrict the transfer of shares were repealed by the vote of the 4,000 shares held by Mrs. Ludgate against 1903½ shares held by other stockholders which protested the repeal and voted against it. The repeal resolution contained a provision requiring every one of the stockholders, within fifteen days after notice by the secretary, to surrender all share certificates held by them, whereupon this proceeding followed.

The learned chancellor ruled (1) that the final article of the by-laws which provided that they (the by-laws) might be "amended, altered, modified or added to" by vote of a majority of the stock applied as much to the article imposing the restrictions on transfer of stock as to any other provisions and that no stockholder had any vested right in the restrictions repealed. (2) He further ruled that apart from that view the restrictive provisions of the by-law had not been continually observed so that abrogation thereof must be implied.

We think the court below erred in both rulings. Though, as observed by the learned chancellor, there are apparently no decisions in this State on the question of the right of a majority to repeal a by-law imposing transfer restrictions on stock, we have no difficulty coming to the opposite conclusion on general principles.

Provisions in corporate by-laws may, generally speaking, be divided into two classes (a) those that are mere regulations governing the conduct of the internal affairs of the corporation. These may be repealed, altered and amended at the will of the majority unless a greater vote is required by the by-laws themselves or by statute. (b) Provisions in the nature of a contract which are evidently designed to vest property rights *inter se* among all stockholders. These cannot be repealed or changed without the consent of the other parties whose rights are affected.

The provision here sought to be repealed is clearly in class (b), for it is in effect a contract between the corporation and its stockholders and the stockholders with each other whereby each stockholder in consideration of his taking the stock subject to the restriction imposed, is given an option to have the stock any other stockholder wishes to sell, first offered to the company or to him in proportion to his interest in the company. The contract is evidenced by the provisions printed on the certificates which become binding on the acceptance of the certificate. So viewed it is idle to argue that stockholders are not being deprived of a substantial property right contrary to the law of the land which forbids the deprivation of property without due process of law.

Mrs. Ludgate herself accepted the certificate for the stock she bought subject to the restrictions which she now seeks to eliminate. Having so agreed to them she is bound by them and had she endeavored to resell all or any part of the stock so acquired without giving her fellow stockholders the option to first buy it, she could have been restrained. Is a court of equity so blind as to permit her to do by indirection what she may not do directly?

While it is true there are no decisions in this state on the particular question just discussed, we are not without precedent in other jurisdictions, as the brief of appellants' counsel shows: see *Cowles v. Cowles Realty Co.*, 194 N. Y. S. 546 (1922), which similarly rules the exact point. That certain types of by-laws are to be regarded as a contract between the corporation and its stockholders and with each other is not at all a new doctrine: 8 Fletcher, Cyclopedia of Corporations (Permanent Edition) pp. 756, 757, sec. 4198. In *Bushway Ice Cream Co. v. Fred H. Bean Co.*, 284 Mass. 239, 187 N. E. 537 (1933), the Court said, "By-laws constitute in effect a contract between the different members and the corporation." Illustrations of the application of the same principle are: *Vanden Bosch v. Michigan Trust Co.*, 35 F. 2d 643 (C. C. A. 6) (1929), where a corporate majority sought to amend by-laws to substitute old preferred stock with new, the court said, "The power of the corporation to amend its articles or its by-laws cannot extend to the making of a change which would amount to a repudiation of a contract which is distinct from, and in addition to, all ordinary matters of internal management, regulation and control." *Loch v. Paola Farmers etc. Assn.*, 130 Kan. 522, 287 Pac. 269 (1930), where a by-law required the corporation to repurchase a stockholder's shares upon his death or removal from the vicinity was held to be immune from repeal. And see *Constructors Association of Western Pennsylvania v. Seeds*, 142 Pa. Superior Ct. 59, 15 A. 2d 467 (1940), holding a by-law of an incorporated association constitutes an agreement between the association and its members and is subject to the same rules of construction as a written contract signed by all parties.

There remains but to be said that by-laws restricting the transfer of stock as here have been recognized

in this State as serving a useful purpose, lawful and enforcible: *Garvin's Estate,* 335 Pa. 542, 6 A. 2d 976 (1939); *Fitzsimmons v. Lindsay,* 205 Pa. 79, 54 A. 488 (1903); *Garrett v. Philadelphia Lawn Mower Co.,* 39 Pa. Superior Ct. 78 (1909).

The second reason advanced by the learned chancellor for dismissing the bill is equally untenable. The chancellor found that many shares issued by Coleman Company including shares issued to the plaintiffs, were issued without the restrictions having been observed and upon that ground held that the section in question must be regarded as suspended or abrogated because of this long continued disregard. In so ruling he relied on our recent case of *Elliott v. Lindquist,* 356 Pa. 385, 52 A. 2d 180 (1947).

We agree with the learned counsel for the appellants that the sweeping conclusion of the court below is not justified by the undisputed evidence. We are not bound to accept fact findings where they rest on inferences from evidence that is undisputed: *Jac Estate,* 355 Pa. 137, 143, 49 A. 2d 369 (1946). Such evidence here shows that the Coleman Company was originally organized by M. T. Garvin, Bechtold and Cauller for the express purpose of taking over the Garvin Company's real estate and at the organization meeting a resolution authorized the purchase of that real estate for all of the Coleman Company's capital stock M. T. Garvin's subscription was assigned to Garvin Company to carry out that resolution. M. T. Garvin & Company therefore became in effect an original stockholder of all the stock except the two shares issued to Bechtold and Cauller, the other two incorporators.

The subsequent transfers fall within three groups or transactions: (1) January 2, 1931, within two days after the organization meeting of Coleman Company,

Garvin Company distributed 4,000 of its 5,998 shares to M. T. Garvin Co. shareholders (who were also its employees). Of the amount so distributed, M. T. Garvin received 3,280 shares directly and purchased from the other distributees 720 shares. Thus, at the completion of the plan, M. T. Garvin held 4,000 shares, Garvin Company 1,998 shares, Bechtold 1 share and A. A. Cauller 1 share. It appears to us these transactions were clearly pursuant to and should be regarded as one plan.

Thereafter there was no transfer of stock from January 2, 1931, until the transfer of M. T. Garvin's 4,000 shares by his Executor to Mrs. Ludgate on May 10, 1941. *Then the stock transfer restrictions were observed.* The third or last group of transfer transactions occurred on December 29, 1941, when Garvin & Company distributed 300 shares of its stock to 44 of its own stockholders all of whom were also its employees and the purchase by the four principal stockholders of the shares so distributed from the other 40. Mrs. Ludgate signed these new stock certificates as president.

This evidence effectually distinguishes the instant case from *Elliott v. Lindquist, supra.* In the *Elliott* case it was established as a fact that from the inception of the corporation (a close corporation of 6 stockholders) in 1918 to the date of the suit in 1945, the restriction in the by-laws had not been complied with in a single instance. The restrictions there had *never* been observed. The rationale of that decision of course is that since all parties entitled to the benefit of stock transfer restrictions are competent to agree expressly to abrogate them, they may do so just as effectually by implication. It having been found in that case that they had done so by their conduct, the conclusion there reached naturally followed.

Under the undisputed facts of this case it cannot be fairly concluded that *all* transfers were made without observance of the rule, or that such so made were intended to abrogate the provision. Certainly no such conclusion can be drawn from the way in which the original issue and transfers back to Garvin took place. Nor is it even clear that when shareholders and employees of Garvin & Company acquired stock from each other they did not act under the reasonable assumption that the exemption of transfer to employees in the by-law referred to employees of the Garvin Company. Coleman Company was clearly not an operating company; it had *officers* but in all probability, being a mere holding company, had few, if any, *employees*. Under such circumstances a conclusion of intention to waive or abrogate the restrictions by conduct cannot reasonably be drawn.

Finally, what is more important, the 4,000 share stock transfer to Mrs. Ludgate, which carried control of the company, was not made until after the transfer restrictions were scrupulously observed by the Garvin executors. Since these executors controlled or were in position to control the company, from Garvin's death in 1937 to 1941, when they sold the stock, their action is eloquent evidence that they regarded the restrictive by-law as still in full force and effect. This alone would prevent the conclusion that the restriction of the by-laws had been waived or abrogated by conduct.

In the Elliott case the restrictions were *never* observed. A stockholder may at times not choose to enforce a right and the failure to do so does not necessarily deprive him of the right. We approve the applicable rules as laid down in Restatement of Property, where it is said, "Sec. 421(d): If the otherwise valid restraint on alienation is capable of successive violations, conduct amounting to a waiver of one or

more known single violations does not condone future breaches or otherwise terminate the restraint, except in situations justifying the finding of an estoppel."

"Sec. 422(c) : An estoppel as to one or more violations of a valid restraint [on alienation of property], does not bar the exercise of the power to enforce that restraint against subsequent violations or otherwise terminate the restraint, unless the circumstances under which the estoppel arose give it that force." In this case there was of course no element of estoppel.

The decree is reversed and the court below is directed to enter a new decree granting the relief prayed for by the plaintiffs, costs to be paid by the appellees.

Mr. Justice BELL dissents.