**SEVEN SPRINGS FARM, INC., a Pennsylvania Corporation, Appellee,**

v.

**Lynda Dupre CROKER, Appellant.**

**Lynda M. Dupre on behalf of the Phillip Dupre Family, Appellants,**

v.

**Seven Springs Farm, Inc., along with Certain of its Directors, James M. Crowley, Denise M. Dupre, James M. McClure, Joyce S. Monigal, Richard G. Patton, Charles N. Santry, Frank S. Sujansky, and James V. Sujansky, Appellees.**

Superior Court of Pennsylvania.

Argued Dec. 1, 1999.

Filed March 13, 2000.

Richard W. Gladstone, III, Pittsburgh, for Lynda Dupre Croker.

David L. McClenahan, Pittsburgh, for Seven Springs Farm, Inc.

Before CAVANAUGH, DEL SOLE,* POPOVICH, JOHNSON, HUDOCK, FORD ELLIOTT, EAKIN, MUSMANNO and LALLY–GREEN,* JJ.

EAKIN, J.:

¶ 1 Seven Springs Resort, founded by Adolph and Helen Dupre in 1932, was incorporated in Pennsylvania as Seven Springs Farm, Inc., in 1959. Adolph and

Helen Dupre had three children, Phillip Dupre, Herman Dupre and Luitgarde Dupre (Sujansky), among whom they distributed all the stock of Seven Springs in equal shares. Each child's descendants still control one-third of the stock, although there are now 45 different shareholders. Appellant Lynda M. Dupre Croker, one of Phillip Dupre's daughters, represents the interests of that family in this litigation.

¶ 2 On July 1, 1959, soon after incorporation, the shareholders entered into a restrictive stock transfer agreement. In 1969, the shareholders signed an "Agreement Affecting the Transfer of the Common and Preferred Stock of Seven Springs Farm, Inc." replacing the 1959 agreement. This "Buy/Sell Agreement" provided in relevant part:

> 2. *Option to Corporation.* Except as provided in paragraph 1, no Stockholder, estate of a Stockholder or transferee who has received any stock in accordance with the provisions of paragraph 1, or any other transferee shall transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock in the Corporation, or certificates of ownership interest representing the same, now owned or hereafter acquired by him, without first giving to all other Stockholders and to the Corporation at least 30 days written notice by registered mail or personal delivery with receipt acknowledged in writing of his intention to make a disposition of his stock.

> \* \* \*

> ... all the stock of the Stockholders or transferee desiring to make any such disposition shall be offered for sale and shall be subject to an option to purchase or to retire on the part of the Corporation,

---

* Recused from participation in this matter.

\* \* \*

The filing of a voluntary or involuntary petition in bankruptcy by any Stockholder and the occurence [sic] of any insolvency of any Stockholder, the making of an assignment for the benefit of creditors or the entrance into any composition agreement with creditors shall be construed as an offer to sell all of the shares of such Stockholder to the Corporation under the provisions of this agreement.

3. *Option to Stockholders.* If all of the stock of the Stockholder or transferee desiring to make a disposition thereof is not purchased by the Corporation in accordance with the provisions of paragraph 2, then the stock not so purchased or retired shall be offered for sale and shall be subject to an option on the part of each Stockholder to purchase a proportionate share...

\* \* \*

5. *Waiver of Restrictions.* The transfer, assignment, sale, pledge, hypothecation, mortgage, alienation or other encumbrance or disposition of any shares of stock of the Corporation made under and by virtue of a written consent to such disposition signed by all of the holders of the common capital stock subject to this agreement at the time of such proposed action and filed with the secretary of this Corporation is expressly excepted from the restrictions herein imposed; provided, however, that any such disposition shall be made only upon the terms and conditions and to the person or persons named in such written consent filed with the Corporation.

¶ 3 On December 6, 1997, the Buy/Sell Agreement was amended by unanimous vote of all shareholders, to add the following paragraph:

Further, any sale of any shares of the capital stock of the Corporation which occurs prior to January 1, 1999 in a transaction which imputes to the Corporation a total capitalization of Seventy Million Dollars ($70,000,000) or more and which is approved by the holders of seventy-five percent (75%) of the common capital stock of the Corporation, which approval is expressed in writing and filed with the secretary of this Corporation, is expressly excepted from the restrictions and obligations herein imposed.

All other provisions of the Agreement were ratified when this amendment was made.

¶ 4 On June 1, 1998, the Board called a shareholders meeting when Booth Creek Ski Holdings, Inc., expressed interest in acquiring Seven Springs. The Herman Dupre and the Luitgarde Dupre Sujansky families voted to pursue the offer, while the Phillip Dupre family voted against it. Because two-thirds of the shareholders wished to go forward, Seven Springs entered into a letter of intent to merge with a subsidiary of Booth Creek, Booth Creek Ski Acquisitions, Inc. In compliance with the Pennsylvania Business Corporation Law (BCL), a Merger Agreement and a Plan of Merger were drafted, approved by the Board on August 18, 1998, and prepared for a ratification vote by the shareholders at a meeting scheduled for October 3, 1998. Termed a "cash out merger," the plan called for the shareholders of Seven Springs to receive cash for their shares, rather than stock in the surviving corporation.

¶ 5 On August 21, 1998, Seven Springs and certain of its directors filed a declaratory judgment complaint, seeking a determination the Buy/Sell Agreement was not applicable to the proposed deal; three days later appellant filed a complaint seeking a declaratory judgment to the contrary. The trial court consolidated the cases, expedited discovery, and the case quickly proceeded to trial. The trial court ultimately determined the proposed merger was not within the scope of the Agreement. Post-trial motions were denied, and on December 2, 1998, the decree *nisi* was

entered as a final decree. This appeal followed, in which appellant frames the following issues:

1. Does a shareholder's vote to approve a cash-out merger (which would convert his or her stock into cash) constitute an attempt to "dispose" of that stock so as to trigger a right of first refusal in a Buy/Sell Agreement covering any proposed disposition of stock?

2. Should a court in equity allow some shareholders to avoid a right of first refusal, applicable to any direct sale or other disposition of stock, by their selling their stock to a third party through a cash-out merger requiring shareholder approval?

3. May a shareholder's right of first refusal be circumvented by a sale of substantially all of the corporation's assets and should this issue be resolved in the absence of any proposed asset sale? [1]

¶ 6 Simply put, if the terms of the Buy/Sell Agreement encompass this merger, 75% shareholder approval is needed to proceed; if the Agreement is not applicable, the vote would be governed by general corporation law and only majority shareholder approval of the Board's action is needed. 15 Pa.C.S. § 1924(a). In practical terms, if the Agreement applies, it allows appellant's family an opportunity to defeat the merger – if it does not, the merger may proceed despite their opposition.

¶ 7 "The interpretation of a contract is a question of law. In deciding an issue of law, an appellate court need not defer to the conclusions of the trial court." *Banks Engineering Co., Inc., v. Polons*, 697 A.2d 1020, 1022 (Pa.Super.1997) (citations omitted), *appeal granted*, 550 Pa. 715, 706 A.2d 1210 (1998). When the language of a contract is unambiguous, we must interpret its meaning solely from the contents within its four corners, *Id.*, at 1023, consistent with its plainly expressed intent. *Hahalyak v. A. Frost, Inc.*, 444 Pa.Super. 494, 664 A.2d 545, 549 (1995). We may not consider extrinsic evidence unless the terms are ambiguous. *Metzger v. Clifford Realty Corp.*, 327 Pa.Super. 377, 476 A.2d 1, 5 (1984). A contract is not ambiguous merely because the parties do not agree on its construction. *Id.*

¶ 8 Neither the original nor amended versions of the Agreement include the term "merger." That the Agreement does not speak to a merger does not in itself result in an ambiguity; when a contract fails to provide for a specific contingency, it is silent, not ambiguous. *Banks*, at 1023. In such circumstances, we will not read into the contract a term, "merger," which clearly it does not contain. "It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982) (citations omitted). The most we can say is the parties either intended to exclude mergers, or did not anticipate or consider such an event.

¶ 9 The trial court determined the primary purpose of the Agreement was to restrict the transfer of shares by individual shareholders. Appellant claims a more specific intent, to provide an opportunity for Seven Springs to remain in the Dupre family,[2] and maintains the catch-all phrase "... or in any other way ... dispose of ..." therefore should be interpreted to encompass all events inconsistent with that

---

1. Although the trial court heard limited evidence regarding an asset sale, and ruled on its applicability, we need not address this question in light of our disposition of the merger issue.

2. The Agreement merely states as follows:

   WHEREAS the Stockholders desire to promote their mutual interests and the interests of the Corporation by imposing certain restrictions and obligations on themselves, the Corporation, and the shares of stock of the Corporation.

purpose, including merger; she contends that in voting for a merger, a stockholder is voting to "dispose of" his or her shares within the meaning of the Agreement.

■ ¶ 10 The trial court found the Agreement to be clear and unambiguous. As such, it disregarded certain extrinsic evidence [3] regarding the intent of the parties and concluded the Agreement was not intended to apply to mergers or other fundamental corporate changes. The trial court also found credible the testimony of James McClure, long-time employee of Seven Springs and, at time of trial, the President and Chairman of the Board of Directors; he is not a shareholder nor a member of the Dupre family. McClure testified about the merger process and his observations of the Dupre family discord, leading the court to conclude the proposed merger had a legitimate business purpose. In a declaratory judgment action, we may not substitute our judgment for the trial court's factual determinations where they are adequately supported by the record. *Fred E. Young, Inc. v. Brush Mountain Sportsmen's Association*, 697 A.2d 984, 987 (Pa.Super.1997), *appeal denied*, 555 Pa. 689, 722 A.2d 1057 (1998), *cert. denied*, 525 U.S. 876, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998).

■ ¶ 11 Even when strictly construing the Agreement, we must be aware of the context in which the Agreement arose. *Steuart*, at 661. The Supreme Court has observed:

We are not unmindful of the dangers of focusing only upon the words of the writing in interpreting an agreement. A court must be careful not to "retire into that lawyer's Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair[,] inspect the text, and answer all questions without raising his eyes."

*Id.*, at 662 (quoting *Estate of Breyer*, 475 Pa. 108, 379 A.2d 1305, 1309 n. 5 (1977)). Nevertheless, we cannot assume the language of the Agreement was chosen carelessly. *See Steuart*, at 662. Viewed in context, we cannot disagree with the trial court's finding that the "primary purpose of the Agreement is to restrict the sale or transfer of stock in Seven Springs *by individual shareholders*." Trial Court Opinion, 10/30/98, at 9 (emphasis added).

¶ 12 The parties are not unsophisticated; they clearly are familiar with corporate formalities and had legal advice in drafting the Buy/Sell Agreement and its amendments. Given this, the silence of the Agreement regarding fundamental *corporate* acts such as merger is conspicuous. The Agreement expressly speaks to specific *stockholder* events such as voluntary and involuntary petitions in bankruptcy, and assignments for the benefit of creditors, but not to a single corporate act such as merger. We cannot conclude this distinction was an oversight.

¶ 13 Neither does the fact the stockholders must vote to approve a merger change its nature as an appropriate act of the corporation and its directors, rather than its stockholders. By focusing on the words "dispose of," appellant loses sight of the prefatory words of the Agreement, "no Stockholder shall ...." Taking the Agreement in its entirety (not just the words

3. Appellant relies on letters written by the attorney who drafted the 1969 Agreement to establish the purpose of the amendment. For example, appellant cites an October 8, 1968 memorandum, in which the attorney stated:

Seven Springs is a classic example of a closely held corporation and it is understood that the family does not wish its shares to fall into the hands of outsiders.

To accomplish this purpose, it is recommended that the corporation and its shareholders execute a mutual obligation buy-sell agreement covering all common and preferred stock outstanding. The present agreement is inadequate.

The trial court admitted the letters, but only to explain the conduct of the parties, not as extrinsic evidence explaining an ambiguity.

"dispose of"), it seems plain it is a *stockholder's* act that makes it applicable, not a fundamental *corporate* act such as merger. While paragraph 11 of the Buy/Sell Agreement obligates the corporation to a degree, it is an obligation to cooperate with the aims of the Agreement; we cannot read the provisions to be violated by the merger at hand.

■ ¶ 14 We agree the Agreement is clear and unambiguous; a merger is not an act triggering its application. This is so not only because merger is not an expressly listed event, but also because the language contemplates the act of a stockholder, not the corporation. *See Bethlehem Steel Corp. v. MATX, Inc.*, 703 A.2d 39, 42 (Pa.Super.1997) ("[A] court may not disregard a provision in a contract if a reasonable meaning may be ascertained therefrom ... each and every part of it must be taken into consideration and given effect, if possible, and the intention of the parties must be ascertained from the entire instrument") (citation omitted). As the trial court aptly reasoned:

> [T]he restrictions of paragraph two of the agreement include restrictions on the Stockholders' ability to "transfer, assign, sell, pledge, hypothecate, mortgage, alienate or otherwise encumber or dispose of ..." any part of his or her stock in the Corporation. These terms cover the possible methods by which an individual stockholder may wish to divest himself or herself of the stock. None of the words apply to changes by operation of law undertaken by the Corporation itself. Nowhere in the agreement is Seven Springs, as an entity, prohibited or restricted in any way from engaging in conduct that is fundamental to the existence of the Corporation. The only restriction on the powers of Seven Springs regards the Corporation's role as a shareholder. This restriction is the same as the one imposed on all other individual shareholders.

Trial Court Opinion, 10/30/98, at 14.

■ ¶ 15 Appellant argues the proposed "cash-out" merger is for all intents and purposes a sale, bringing it within the catch-all language of the Agreement. Indeed, the record strongly suggests the proposal was structured as a merger to circumvent the Buy/Sell Agreement. These families are embroiled in bitter infighting, and one may easily conclude from the record that appellees are cloaking a sale in the accouterments of merger to circumvent appellant and the block of shares she represents; however, one may as easily conclude appellant's block is objecting to the merger for obstructive personal reasons as well. Both conclusions may be true, but this is immaterial to our inquiry. We are interpreting a contract, not the reasons for the positions of the parties. The question is the propriety of the merger, not the motivations behind it.

¶ 16 The Supreme Court has recognized the distinction between a "merger" and a "sale" is not easy to determine.

> [I]t is no longer helpful to consider an individual transaction in the abstract and solely by reference to the various elements therein determine whether it is a 'merger' or a 'sale'. Instead, to determine properly the nature of a corporate transaction, we must refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable.

*Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25, 28 (1958).

¶ 17 Pennsylvania's BCL does not define merger [4] but describes its effect: the sepa-

---

4. Merger has been defined as the "uniting of two or more corporations by the transfer of property to one of them, which continues in existence, the others being merged into it." 15 Fletcher Cyclopedia of the Law of Private Corporations § 7041; 9 P.L.E. Corporations

§ 471. "In a merger, one or more constituent corporations (each a disappearing corporation) merge into and become part of another constituent corporation that continues to exist after the merger has been consummated." John W. McLamb, Jr. and Wendy C.

rate existence of all parties to the merger cease, except that of the surviving corporation, which succeeds to the assets and liabilities of merged corporations. 15 Pa.C.S. § 1929(a) and (b). Pennsylvania courts historically have viewed merger as an event distinct from a sale. *See Commonwealth v. Willson Products, Inc.*, 412 Pa. 78, 194 A.2d 162, 166 (1963) (list of cases).

In *In re Jones' Estate*, 377 Pa. 473, 105 A.2d 353, on page 477, 105 A.2d 353, on page 355, the Court, quoting from *In re Buist's Estate*, 297 Pa. 537, 147 A. 606, said: " 'The merger of two or more corporations is neither a sale nor a liquidation of corporate property, but a consolidation of properties, powers, and facilities of the constituent companies, forming a new corporate entity.* * *[a] merger of two corporations cannot be considered as a sale of their property by the constituent companies,* * *.' " *See* to the same effect, *Weinroth, Executrix v. Homer B. & L. [Bldg. & Loan] Ass'n*, 310 Pa. 265, 269, 165 A. 28; *United States v. Seattle–First National Bank*, 321 U.S. [583] 383, 64 S.Ct. 713, 88 L.Ed. 944; *Rochelle Investment Corporation v. Fontenot*, D.C., 34 F.Supp. 118; *United States [U.S.] v. Niagara Hudson Power Corporation*, D.C., 53 F.Supp. 796; *Dodier Realty & Investment Co. v. St. Louis National Baseball Club*, 361 Mo. 981, 238 S.W.2d 321, 24 A.L.R.2d 683; *Pittsburgh Terminal Coal Corporation v. Potts*, 92 Pa.Super. 1; *Segal v. Greater Valley Terminal Corporation*, 78 N.J.Super. 42, 187 A.2d 374; *National Dairy Products Corporation v. Carpenter*, Mo., 326 S.W.2d 87.

*Id.; accord, Frandsen v. Jensen–Sundquist Agency, Inc.*, 802 F.2d 941, 944 (7th Cir.1986) ("[I]n a merger the shares of the acquired firm are not bought, they are extinguished."); *Versyss Inc. v. Coopers and Lybrand*, 982 F.2d 653, 655 (1st Cir. 1992)(same).

Shiber, Pennsylvania Corporate Law and

¶ 18 Appellant's broad construction imputes too much into the catch-all language of the Agreement. In Pennsylvania, such restrictive agreements are disfavored and are to be strictly construed. *Rouse & Associates v. Delp*, 442 Pa.Super. 226, 658 A.2d 1383, 1384 (1995); *In re Trilling & Montague*, 140 F.Supp. 260, 261 (E.D.Pa.1956). In *Rouse*, which also involved a family-held corporation, this Court strictly construed an agreement by which the shareholders agreed not to " 'sell, transfer, give, pledge, assign or in any manner encumber or alienate any of the stock' without first offering it to the corporation or to the other stockholders." *Id.*, at 1384. We declined to infer a restriction on the involuntary sale of stock by judicial process because the agreement did not expressly impose such a restriction. *Id.*, at 1385.

¶ 19 Appellant submits *Bruns v. Rennebohm Drug Stores, Inc.*, 151 Wis.2d 88, 442 N.W.2d 591 (App.1989), provides authority for generously interpreting the language of the Buy/Sell Agreement. *Bruns* involved an agreement granting a right of first refusal to shareholders in a close corporation if any shareholder "determines to sell" their shares. The issue before the court was whether a proposed (cash-for-stock) merger triggered the right of first refusal. The court held "substance controls over form" and that the merger constituted a sale of the stock. *Id.*, at 594–95.

¶ 20 The reasoning in *Bruns* chafes with Pennsylvania's policy of strictly construing restrictive stock transfer agreements. *See Rouse, supra.* Moreover, appellant's reliance on *In re Estate of Mather*, 410 Pa. 361, 189 A.2d 586 (1963), is of no avail as it stands for the proposition such agreements are valid and enforceable; the court in *Mather* did not purport to interpret more than the intent underlying that particular agreement. We find *Bear v. Stegkamper*, 65 Pa. D. & C.2d 134 (Com. Pl. Mercer Co.1974), also cited by appellant, distinguishable from the circumstances in this

Practice § 9.3[b] (1993 Supplement).

case. *Bear* involved a sale of assets, not a merger, and the agreement granting a right of first refusal was framed differently than the instant agreement.

¶ 21 Appellees contend *Shields v. Shields*, 498 A.2d 161 (Del.Ch.1985), *appeal denied*, 497 A.2d 791 (Del.1985), is the more persuasive case regarding a restrictive stock transfer agreement between family members in a closely held corporation. *Shields* involved a stock-for-stock merger and the agreement provided for a right of first refusal if any shareholder sought to "sell, give, pledge, dispose of by will, gift in trust or in any manner otherwise dispose of his or her stock." *Id.*, at 167. The purpose of the merger in *Shields* appeared to be solely to avoid the restrictions of a buy/sell agreement, and the shareholders opposing merger argued the merger was a disposition of stock within the terms of the agreement. The Delaware Chancery Court rejected that argument:

> A merger between or among Delaware corporations is not a stockholders act of the kind the 1966 Agreement sought to restrict; it is a corporate act, albeit one requiring for its effectuation the approval of a majority of the shareholders of the corporation. When duly effectuated, such a corporate act effects by operation of law a transmutation of the stock interest in a constituent corporation.
>
> At the moment a stock for stock merger is effective, the stock in a constituent corporation (other than the surviving corporation) ceases to exist legally. The subject matter of the stockholders' agreement thus vanishes, so to speak, at that point and its place is taken by a stock interest in another, distinct corporation. The merger accomplishes that result and necessarily legally moots the terms of a restriction on transfer of the stock of a disappearing corporation.

*Id.*, at 167–68. The Delaware court observed the minority shareholders' construction of the agreement would result in an anomaly: the shareholders "would have

a right to buy that which has ceased to exist by virtue of the act (i.e., the merger) giving rise to the right." *Id.*, at 168–69. We agree with the learned trial court that *Shields* is persuasive, as it takes into account the entire agreement, and is consistent with the terms of Pennsylvania's BCL. *See* 15 Pa.C.S. § 1929 (describing the effect of merger).

¶ 22 That the proposed merger would result in receipt of cash for Seven Springs stock does not take it out of the realm of merger. The BCL expressly contemplates such "cash-out" mergers. *See* 15 Pa.C.S. § 1922(a)(3) and (b); *see also* 12 Summ. Pa.Jur.2d § 10:35. That appellant will receive cash rather than stock in the surviving corporation does not alter the fundamental fact that the stock in Seven Springs will be no more. As the *Shields* case emphasized, merger is a corporate act that, by operation of law, results in extinction of the constituent corporation's stock. Here, the stock of Seven Springs will cease to exist – it will not be owned by the surviving corporation, or by anyone else.

■ ¶ 23 Appellant also contends equity should bar the merger, as it is an attempt to circumvent the Agreement. Appellant relies principally on a rhetorical question posed by the Supreme Court in *Bechtold v. Coleman Realty Co.*, 367 Pa. 208, 79 A.2d 661 (1951):

> [H]ad she [majority shareholder] endeavored to resell all or any part of the stock so acquired without giving her fellow stockholders the option to first buy it, she could have been restrained. *Is a court of equity so blind as to permit her to do by indirection what she may not do directly?*

*Id.*, at 664 (emphasis appellant's). Appellant contends that, as in *Bechtold*, appellees are attempting to do indirectly by merger what they could not do directly under the Buy/Sell Agreement, and argues the trial court's decree elevates form over substance.

¶ 24 *Bechtold* involves factual circumstances distinguishable from those in this case. In *Bechtold*, majority shareholders attempted to repeal corporate bylaws granting a right of first refusal to shareholders. The Supreme Court determined the bylaw was a contract "designed to vest property rights *inter se* among all stockholders." *Id.*, at 663. The Court determined the majority shareholder accepted the shares subject to the restriction, which could not be repealed without the consent of the minority stockholders. *Id.* We find these distinctions significant, and determine *Bechtold* does not control.

¶ 25 We believe the Seventh Circuit was correct when it observed how formalities are crucial in corporate law. *See Frandsen, supra.* "If the distinction [between a sale of shares and a merger] seems somewhat formalistic, this is an area of law where formalities are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal." *Id.*, at 947. It has been said of corporate law that it is not so much *what* is done, but *how* it is done. Even though this business has family roots, and the infighting has separated the parties along family lines, the fundamental fact remains this is a corporation, every bit as much as IBM and AT & T, and the ability of this *corporation* to act as such is not diminished by an agreement limiting how *shareholders* may dispose of their holdings.

¶ 26 The parties chose the applicable formalities and expressed them in the terms of this Agreement, ratified as recently as 1997, when the parties were battling, which shows two things. First, whatever the intent of the matriarch and her children, parties to the 1959 agreement, the relevant parties and their intent were vastly different when the current version of the agreement was modified in 1997. Any 1959 intent to keep things "in the family" had long since transformed, as there was not "one family" by 1997; any

intent of these parties was limited to the best interests of "my branch of the family" when the 1997 contract was signed.

¶ 27 Secondly, these parties knew full well in 1997 that they were not in a position to run a family business together; something had to give. Affirming the modified Agreement did nothing to restore the Ozzie and Harriet world that existed four decades ago; to impute the intent of the parties in 1959 to the combatants of 1997 is misplaced. Fully aware of this, and fully aware the corporation was examining its divestiture options, appellant took no steps to draft further protection for her position into the new amended Agreement. We cannot do so for her now.

¶ 28 Order affirmed.

¶ 29 JOHNSON, J. files a dissenting opinion joined by CAVANAUGH, J. and MUSMANNO, J.

JOHNSON, J., dissenting.

¶ 1 I must respectfully dissent from my distinguished colleagues' Majority Opinion. I find the Majority's analysis flawed in three respects. First, the Majority errs in interpreting the plain language of the Buy/Sell Agreement to exclude cash-out mergers. Secondly, the Majority errs in concluding that the proposed merger is solely a corporate act, and as such does not constitute "shareholder action." Thirdly, the Majority errs in failing to properly consider the intent of the parties, which underlies accurate interpretation of the Buy/Sell Agreement. I shall address each of these deficiencies, one after another.

¶ 2 Firstly, I find that the Majority improperly interpreted the language in the Buy/Sell Agreement. The Majority strictly construes the Buy/Sell Agreement and relies on *Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020 (Pa.Super.1997), to conclude that since the term "merger" is not explicitly included in the Buy/Sell Agreement, our Court will not insert the term because the parties either "intended to exclude

mergers, or did not anticipate or consider such an event." Majority Opinion at 744.

¶ 3 In my view, a cash-out merger clearly falls within the parameters of the Buy/Sell Agreement, even when strictly construed. The proposed transaction is called a "cash-out merger," but this Court cannot, as the Majority has done, rely on this label alone in determining whether such a transaction is contemplated in the Buy/Sell Agreement; rather, we must look at the substance of the transaction, including its consequences. In *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25 (1958), our Supreme Court recognized the difficulty of properly characterizing business transactions and provided the following guidance:

[T]o determine properly the nature of a corporate transaction, we must refer not only to all the *provisions of the agreement,* but also to the *consequences of the transaction* and to the *purposes of the provisions of the corporation law* said to be applicable.

*Farris,* 393 Pa. at 432, 143 A.2d at 28 (emphasis added). *See also Bruns v. Rennebohm Drug Stores, Inc.*, 151 Wis.2d 88, 442 N.W.2d 591, 595 (App.1989) (concluding that the substance of the transaction prevails over its form).

¶ 4 The proposed plan of merger in this case is a "reverse subsidiary cash merger." Memorandum, *Seven Springs Status Report,* 6/17/98, ¶ (2)(i). The substance of it is as follows: the "[c]apital stock of Seven Springs Farm, Inc. ("SSF") [will be] acquired in a cash out merger, with Booth Creek subsidiary merging into SSF...." *Id.*; N.T. Trial, 9/30/98, at 167. The Booth Creek subsidiary (created by the Booth Creek parent corporation for the sole purpose of this proposed merger) will merge into Seven Springs, and Seven Springs will remain as the surviving corporation. In the language of the Agreement of Merger, the transaction requires the shareholders to "surrender" their shares and the shares will be "converted" in exchange for the right to receive cash on the effective date of the merger. Agreement of Merger,

8/28/98, §§ 2.2(c), 2.3. As a consequence, the family shareholders will not retain ownership of any shares in the surviving corporation after the merger:

From and after the [date the articles of merger are filed with the Department of State of Pennsylvania (designated as the "Effective Time")], [the shareholders] shall have no rights with respect to the Surviving Company by virtue of their ownership of such shares immediately prior to the Effective Time, and each certificate which formerly represented a [share] shall, from and following the Effective Time, represent only the right to receive the respective [cash consideration].

*Id.* at § 2.2(c).

¶ 5 I conclude that this arrangement falls squarely within the parameters of the following provision of the Buy/Sell Agreement:

[N]o Stockholder ... shall *transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock* in the Corporation ... without giving to all other Stockholders and to the Corporation at least 30 days written notice by registered mail or personal delivery with receipt acknowledged in writing of his intention to make a disposition of his stock.

Buy/Sell Agreement, 7/1/59, ¶ 2, at 2 (emphasis added). Where language is clear and unambiguous, we are to interpret its meaning within the "four corners of the document." *Banks Eng'g Co., Inc. v. Polons,* 697 A.2d 1020, 1023 (Pa.Super.1997) *appeal granted,* 550 Pa. 715, 706 A.2d 1210 (Pa.1998) (quoting *First Home Sav. Bank, FSB v. Nernberg,* 436 Pa.Super. 377, 648 A.2d 9, 14 (1994)). In the absence of technical terminology, words of a contract are to be construed according to their plain and ordinary meaning. *Warren v. Greenfield,* 407 Pa.Super. 600, 595 A.2d 1308, 1311 (1991). Where the words are clear and unambiguous, they shall not be

interpreted to conflict with their plain and ordinary meaning. *Id.* at 1312.

¶ 6 I conclude that the language of Paragraph 2 of the Buy/Sell Agreement is clear and its use of the term "dispose" is sufficiently broad to encompass the transaction at issue in this case. The plain meaning of dispose is "to get rid of" or "to transfer into new hands or to the control of someone else." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 654 (1976). Our courts have construed "disposition" to mean "transfer." *Gosewisch v. Com., Dep't of Revenue*, 40 Pa.Cmwlth. 565, 397 A.2d 1288, 1292 (1979) (defining "disposition" in the context of an income tax case). In turn, a transfer *"embraces every method* – direct or indirect, absolute or conditional, voluntary or involuntary – *of disposing of or parting with property or with an interest in property."* BLACK'S LAW DICTIONARY 1503 (7 th ed.1999) (emphasis supplied).

¶ 7 The proposed cash-out merger qualifies as a transaction where the shareholders will be "disposing of," "parting with," or "getting rid of" their shares. As Seven Springs will be the surviving corporation, the shareholders will be required to "surrender" their shares upon the merger. Agreement of Merger, 8/28/98, §§ 2.2(c), 2.3. Pennsylvania's Business Corporation Law (BCL) uses similar language in that a plan of merger must set forth the manner by which shareholders are to "surrender ... any certificates" in exchange for cash. 15 Pa.C.S. § 1922(a)(3). By "surrendering" their shares, the shareholders will have "disposed of" or will have "gotten rid of" their shares in a cash-out merger transaction. Accordingly, the Buy/Sell Agreement was contemplated to embrace situations, such as this, where shareholders are disposing of their shares.

¶ 8 The parties in the instant case anticipated every such potential disposition, by virtue of the plain language in the Buy/Sell Agreement: "[N]o Stockholder ... shall transfer, ... *or in any other way* encumber or *dispose of all or any part of his*

*stock ...."* Buy/Sell Agreement, 7/1/59, ¶ 2, at 2 (emphasis added). Although the Majority purports to use plain meaning in interpreting the Agreement, the Majority declines to define any of these operative terms in the Agreement. Once those terms are defined according to their plain and ordinary meaning, the conclusion that a cash-out merger fits into the purview of the Agreement is inescapable.

¶ 9 Secondly, the Majority errs in concluding that the merger is solely a corporate act and that the disposition of shares arises through operation of law, not through shareholder action. Majority Opinion at 745–46. Likewise, Appellees argue that "[b]ecause the Buy/Sell Agreement restricts only certain stockholder acts ('no Stockholder shall ... dispose of [stock]'), it does not encompass a merger." The Majority and the Appellees overlook the following provision in the Buy/Sell Agreement, which states in pertinent part:

> 11. Agreements by the Corporation.
> In consideration of the promises of the Stockholders, *the Corporation agrees for itself and for its successors and assigns that it shall perform every act that may be required of it to effectuate the provisions of this Agreement* including, but not limited to, the following:
>
> (a) *it will not transfer or reissue any of its shares of stock in violation of this Agreement or without requiring proof of compliance with this Agreement.*
>
> (b) all stock certificates issued by the Corporation during the life of this Agreement shall be endorsed as stated above; ....

Buy/Sell Agreement, 1/10/69, ¶ 11 (emphasis added). Clearly, Seven Springs, as a corporation, is bound to effectuate *all* of the provisions in the Buy/Sell Agreement. This includes effectuating the restrictions on transfer in Paragraph 2 of the Buy/Sell Agreement.

¶ 10 Additionally, notwithstanding the provisions of the Buy/Sell Agreement, as a

matter of law, a cash-out merger is not solely a corporate act. Rather, it requires shareholder action. Pennsylvania's Business Corporation Law requires that shareholders approve the merger plan. 15 Pa. C.S. § 1924(a). Exceptions to this requirement exist, but none of them are applicable to the cash-out merger in the instant case. 15 Pa.C.S. § 1942(b) (indicating that shareholder approval for merger not required in cases of, *inter alia*, a stock-for-stock merger).

¶ 11 Accordingly, the Majority's reliance on *Shields v. Shields*, 498 A.2d 161, 168–69 (Del.Ch.1985), is misplaced. *Shields* involved a stock-for-stock merger where the shareholders retained an ownership interest in the surviving corporation. Here, the Majority relies on the false premise that Seven Springs will cease to exist, and thus the Seven Springs stock will cease to exist. However, our BCL indicates that in a merger, one of the corporations continues to exist. 15 Pa.C.S. § 1929(a). In this case, the Majority completely overlooks that the Plan of Merger expressly provides for Seven Springs to remain as the surviving corporation. However, unlike those shareholders in *Shields*, the shareholders in the instant case will not continue to hold a stock interest in Seven Springs. Here, some of the shareholders voted to dispose of their stock in exchange for cash, and they will not retain any ownership interest.

¶ 12 The facts of the instant case are more congruous with *Bruns v. Rennebohm Drug Stores, Inc.*, 151 Wis.2d 88, 442 N.W.2d 591 (App.1989), where a shareholder, wishing to dispose of his stock in a closely held corporation, was subject to a shareholders' agreement that restricted the sale of stock by vesting the right of first refusal in other shareholders. The shareholder argued, as do the Appellees in the instant case, that the shareholders' agreement did not apply to a merger because a merger was "not a sale, but a transfer of assets by operation of law." *Bruns*, 442 N.W.2d at 594. Under the proposed transaction in *Bruns*, the share-

holders were to receive something of value in exchange for their stock (like the cash-out merger in the instant case). The court determined that the elements of a sale were present, regardless of whether the shareholders were compensated for their shares in cash or in kind. *Id.* at 595. Consequently, the *Bruns* court rejected the transfer-by-operation-of-law argument, and determined that sales were covered under the shareholder agreement. *Id.* Thus the proposed transaction, although deemed a merger, in substance triggered application of the restrictions on transferability.

¶ 13 Furthermore, the shareholders in *Bruns* were obligated to comply with the agreement before the merger was ever accomplished. *Id.* at 597 (holding that shareholder's obligation under stock alienation agreement "probably arose" when shareholder agreed to merger and "certainly arose" when shareholder entered into agreement and plan of merger).

¶ 14 Similarly, Paragraph 2 of the Buy/Sell Agreement explicitly provides that the "*intention* to make a disposition of [one's] stock" is the factor that triggers the rights of notice and first refusal under the Buy/Sell Agreement. Buy/Sell Agreement ¶ 2 (emphasis added). Thus, the majority shareholders' obligation to provide notice of their intent to dispose of their shares and allow the corporation and minority shareholders' the opportunity to exercise the right of first refusal certainly arose at least by the time the majority shareholders voted in favor of the Plan of Merger with Booth Creek on October 3, 1998. However, the intent to dispose of the stock probably arose prior to this final vote, i.e. at the June 13, 1998 shareholders meeting where the majority shareholders voted to pursue divestiture exclusively with Booth Creek. R.R. 785a.

¶ 15 Thus, I reject Appellees' argument that the only action the shareholders took was to vote on the merger, and voting is not proscribed conduct under the Buy/Sell Agreement. Voting was merely the means

of effectuating a transaction that involves the disposition of, or "surrender" of, the family-owned shares in exchange for cash. Furthermore, it is the "intention" to dispose of one's shares that triggers application of the Buy/Sell Agreement. As I have concluded, this "intention" arose at least by the time the majority shareholders voted to effectuate the merger. Accordingly, the rights to notice and first refusal arise prior to the consummation of the proposed merger.

¶ 16 Thirdly, the Majority overlooks the parties' intent as expressed in the Buy/Sell Agreement. The primary object in contract interpretation is to "ascertain and effectuate the intent of the parties." *Warren*, 595 A.2d at 1312 (quoting 4 WILLISTON ON CONTRACTS § 601 (3d ed.1961)).

> When we, as a reviewing court, are asked to interpret or review the meaning of a contract, the intent of the parties is paramount, and our objective is to ascertain the parties' intent as it is manifestly expressed in the agreement itself. The intent of the parties to a written contract is regarded as embodied in the writing itself.

*Warren*, 595 A.2d at 1311. We must read the contract as a whole and give effect to each provision of the contract to properly determine the parties' intent. *Bethlehem Steel Corp. v. MATX, Inc.*, 703 A.2d 39, 42 (Pa.Super.1997). To further discern the parties' intent, we may look at "the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." *In re Estate of Mather*, 410 Pa. 361, 369, 189 A.2d 586, 589 (1963).

¶ 17 The predecessors of the present shareholders unanimously agreed to a restrictive shareholder agreement intending to keep the Seven Springs stock within the family "so as to prevent interference therein by outsiders." Buy/Sell Agreement, 7/1/59, at 2. A new Buy/Sell Agreement, executed in 1969, reinforced the shareholders' intention to keep control of the corporation within the family:

> WHEREAS the Stockholders desire to promote their mutual interests and the interests of the Corporation by imposing certain restrictions and obligations on themselves, the Corporation, and the shares of stock of the Corporation,
>
> It is therefore agreed ...

Buy/Sell Agreement, 1/10/1969, *Preamble*. The "mutual interest" of the parties and the "interests of the Corporation" include restricting transfers to family members and to Seven Springs, the corporation. *Id.* ¶¶ 1, 2. The Buy/Sell Agreement provides specifically that a shareholder may transfer stock by will or gift to his child, but if the stock were made in trust, then the trustee would have to be approved by the other shareholders. *Id.* ¶ 1. Furthermore, a shareholder wishing to dispose of his stock outside of the family must first offer his stock to the corporation and then to the other shareholders. *Id.* ¶¶ 2, 3.

¶ 18 The cover letter to the 1969 Buy/Sell Agreement, composed by the shareholders' attorney at that time, Ralph E. Becker, indicated:

> [T]he agreement requires that the corporation shall have a first option on any proposed transfer of stock (with the exception of a transfer in the bloodline) with the remaining shareholders having a proportionate second option for any stock not purchased by the corporation. The stock may be sold to outsiders only after both options are waived.

Cover Letter from Ralph E. Becker to Herman Dupre, 1/2/69 (Exhibit DX–118), R.R. at 481a. Attorney Becker also stated that Paragraph 2 of the 1969 Buy/Sell Agreement was drafted to prevent a shareholder from "circumventing the intent of preventing transfers to outsiders in *all* cases." *Id.* (emphasis in original). In a prior letter suggesting provisions for the 1969 Buy/Sell Agreement, Attorney Becker stated:

Seven Springs is a classic example of a closely held corporation and it is understood that the family does not wish its shares to fall into the hands of outsiders. To accomplish this purpose, it is recommended that the corporation and its shareholders execute a mutual obligation buy-sell agreement covering all common and preferred stock outstanding. The present agreement [referring to the 1959 Buy/Sell Agreement] is inadequate.

Letter from Ralph E. Becker to Seven Springs, Helen K. Dupre, Philip Dupre, Herman Dupre, and Luitgarde Dupre Sujansky, 10/18/68, (Exhibit DX–4), R.R. at 467a. Luitgarde Dupre Sujansky, one of the signatories to the 1969 Buy/Sell Agreement testified as follows:

Q. Mrs. Sujansky, can you tell the Court as best you can recall what were you and your brothers and your mother attempting to achieve by this Buy/Sell Agreement in 1969?

A. I think to protect each individual—I mean to protect one from the other as not I myself, I couldn't use my stock for collateral or jeopardize it in any way. I think it's for the individual, for the three of us at that time in our family.

Q. So it was to keep—

A. The shareholders, yes.

Q. So it's to keep the stock in the family?

A. Yes; uh-huh.

\* \* \* \*

Q. Was it to keep one of you from selling some of your shares to somebody else against the wishes of the others?

A. Yes; uh-huh.

N.T. Trial, 9/30/98, at 196; R.R. at 199a. James McClure, the President and Chairman of the Board of Seven Springs, who is not a shareholder, assured the shareholders that, "at 75%, it is still impossible for two families (66 2/3%) to conduct a share sale, so if protection of your interest is of

concern, you still have that protection." James N. McClure Memorandum, 12/10/97, (Exhibit DX–24), R.R. at 522a; N.T. Trial, 9/30/98, at 139–40, R.R. 142a–143a. Clearly the protective purpose to be achieved by the Buy/Sell Agreement was, and remains, to keep the Seven Springs stock within the family, as it has been since the incorporation of Seven Springs in 1959. The 1969 Buy/Sell Agreement serves to foster that objective, not to defeat it, as the Majority would assume.

¶ 19 Moreover, I disagree with the Majority's conclusion that shareholders' agreements restricting share transferability are disfavored in Pennsylvania. Majority Opinion at 747. To the contrary, Pennsylvania's BCL approves shareholder agreements that impose any lawful restriction on the transfer of shares. 15 Pa.C.S. § 1529(b), (e). For example, shareholders' right of first refusal and right to consent to any proposed transfer are restrictions specifically authorized in an agreement restricting share transferability:

(c) **Restrictions specifically authorized.**—A restriction on the transfer of securities of a business corporation is permitted by this section if it:

(1) obligates the holder of the restricted securities to offer to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities;

\* \* \* \*

(3) requires the corporation or the holders of any class of securities of the corporation to consent to any proposed transfer of the restricted securities or to approve the proposed transferee of the restricted securities. . . .

15 Pa.C.S. § 1529(c)(1), (3). The Pennsylvania Supreme Court has said that restrictions on the transfer of shares serve a

"useful purpose" and are "lawful and enforcible [sic]." *Bechtold v. Coleman Realty Co.*, 367 Pa. 208, 214, 79 A.2d 661, 664 (1951). Our Supreme Court has also said, "family agreements are always favored in the law." *In re Estate of Mather*, 410 Pa. at 369, 189 A.2d at 590 (upholding validity of stock transfer restrictions among family members where there was no evidence of fraud or deceit when the agreement was created, and the agreement operated to the mutual benefit of all parties). *See also Bruns*, 442 N.W.2d at 595 ("[A] right of first refusal or first purchase is not a restraint on the alienation of property if its terms are reasonable as to price and time.... A reasonable right of first refusal does not reduce the opportunity to sell; in fact, it provides a possible buyer who is constantly available."). The valuable purpose to be served by such agreements among family members includes preventing intrusion by outsiders into the family-business. *In re Estate of Mather*, 410 Pa. at 369, 189 A.2d at 589.

¶ 20 The Buy/Sell Agreement in the instant case provides a reasonable and lawful restraint on transferability of shares, which is specifically approved by our BCL. These terms include the requirement that a shareholder, who intends to dispose of his shares, first offer the shares to Seven Springs and then to other shareholders. Buy/Sell Agreement, 1/10/69 ¶¶ 2, 3. This right of first refusal is to be exercised within a reasonable time, i.e. at a shareholders' meeting to be held within 30 days from the time the shareholder wishing to dispose of his stock gives written notice of his intention to dispose of his stock. *Id.* A separate provision entitled, "Free Transferability of Shares," permits a shareholder to dispose of his stock freely if the right of first refusal vested in the corporation and shareholders is not exercised within the required time frame. *Id.* at ¶ 4. The Buy/Sell Agreement required a unanimous vote of the shareholders to waive the restrictions on the transfer of stock. *Id.* at ¶ 5. However, this provision was later amended to require at least 75% of the

shareholder vote instead of a unanimous vote to effectuate a waiver of the restrictions on the transferability of shares. Buy/Sell Agreement Amendment, 12/6/97. Nevertheless, the majority shareholders pursued disposal of their shares outside of the family in contravention of a reasonable and lawful Buy/Sell Agreement. At the shareholders' meeting on June 13, 1998, 66 2/3% of the shareholders (also referred to as the majority shareholders) voted to proceed with the divestiture process exclusively with Booth Creek. Shareholders Meeting, 6/13/98; R.R. at 785a. The majority shareholders (66 2/3%) subsequently voted in favor of the cash-out merger on October 3, 1998.

¶ 21 The Buy/Sell Agreement inures to the benefit of all shareholders by providing protection to this family-owned business against intrusion by outsiders. Its terms are reasonable, and it is an agreement among family members; therefore, its existence and purpose is favored in Pennsylvania. *See In re Estate of Mather*, 410 Pa. at 369, 189 A.2d at 590. My colleagues' conclusion that these agreements are disfavored is contrary to the established law in Pennsylvania.

¶ 22 Finally, Appellant raises the question of whether an asset sale would circumvent the restrictions on transferability of shares in the Buy/Sell Agreement. Although the Majority does not analyze this issue, the trial court, in response to the issue raised by Seven Springs' counsel during closing arguments, concluded that an asset sale would not be subject to the Buy/Sell Agreement. Trial Court Opinion, 10/30/98, at 5–6. The trial court made this finding despite its recognition that an asset sale was "not the subject of this litigation." *Id.* at 6. Since an asset sale was not in controversy, the issue of whether such transaction would be subject to the Buy/Sell Agreement was not ripe for adjudication in a declaratory judgment action. *See Cherry v. City of Philadelphia*, 547 Pa. 679, 685, 692 A.2d 1082, 1085 (1997). I

would vacate the trial court's ruling on this issue.

¶ 23 Moreover, I note that the board of directors failed to pursue an alternative proposal, introduced by the minority shareholder representative, Lynda M. Dupre. Her proposal called for an employee stock ownership plan (ESOP), which would permit the shareholders who wished to retain their shares to do so, and those who wished to sell, to do so at a price superior to the Booth Creek offer. Letter from Lynda M. Dupre to James McClure, 8/10/98, (Exhibit DX–118), R.R. at 718a. In response, James N. McClure denied Ms. Dupre's request for a meeting with department heads and key employees to discuss the ESOP proposal. He further stated that ⅔ of the shareholders wanted to pursue Booth Creek's merger proposal and that the board had directed him to pursue the same. *Id.* He encouraged Ms. Dupre not to pursue the ESOP, as it would confuse, disrupt, and further stress the staff and management of Seven Springs. *Id.*

¶ 24 Directors of a corporation have a fiduciary duty toward the corporation and its shareholders. 15 Pa.C.S. §§ 512(a), 1712(a). *See also Korman Corp. v. Franklin Town Corp.*, 34 Pa. D. & C.3d 495 (Com.Pl.1984). Directors must serve the best interests of the corporation and act in good faith. 15 Pa.C.S. § 512(a). This duty includes an obligation to make reasonable inquiries and act with the skill and diligence that an ordinary person would use under similar circumstances. *Id.* Both directors and majority shareholders owe the minority shareholders a duty of care, diligence, and good faith, and therefore must act to protect the minority shareholders' interests. *Baran v. Baran*, 166 Pa.Super. 532, 72 A.2d 623 (1950).

¶ 25 If the board of directors failed to adequately address Ms. Dupre's ESOP proposal, the board members may have breached their fiduciary duty to the shareholders, although the trial court made no specific findings on this issue. The board's alleged failure to explore alternative proposals that may have been more advantageous to the shareholders, if established, would place in question the propriety of the board's approval of the cash-out merger.

¶ 26 Finally, adoption of the Majority's conclusion that the cash-out merger is not subject to the terms of the Buy/Sell Agreement would place in jeopardy the validity and effect of restrictive shareholder agreements in closely held corporations throughout the Commonwealth. Board members of such corporations will be on notice that they may use the device of the cash-out merger to circumvent shareholders' agreements heretofore understood to be binding. I find this to be a troubling precedent, if permitted to be established.

¶ 27 For the foregoing reasons, I conclude that the vote by some of the members of the family, on October 3, 1998, to adopt the Plan of Merger constituted a shareholder's act, which triggered the right of first refusal contained in the Buy/Sell Agreement as amended. I conclude that the subject Buy/Sell Agreement does apply to the proposed merger. Accordingly, I would reverse the Order entered on December 2, 1998 in the Court of Common Pleas of Somerset County and remand with directions that judgment be entered in favor of Lynda Dupre Croker at No. 535 Civil 1998, and in favor of Lynda M. Dupre at No. 543 Civil 1998, with costs on Seven Springs Farm, Inc. at both actions.

¶ 28 CAVANAUGH, J. and MUSMANNO, J. join this Dissenting Opinion.