# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>CECILIAN PARTNERS, INC., a Delaware corporation,<br><br>   Plaintiff,<br><br>  v.<br><br>COMPANY FIFTEEN, LLC, a Delaware limited liability company, and DANIEL WEBSTER,<br><br>   Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td rowspan="2">C.A. No. 2025-0598-BWD</td></tr>
<tr><td>COMPANY FIFTEEN, LLC, a Delaware limited liability company, and DANIEL WEBSTER,<br><br>   Counterclaim Plaintiffs,<br><br>  v.<br><br>CECILIAN PARTNERS, INC., a Delaware corporation, and JOHN D. CECILIAN, JR.,<br><br>   Counterclaim Defendants.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td></tr>
</table>

## MEMORANDUM OPINION GRANTING MOTION FOR SUMMARY JUDGMENT

Date Submitted: February 23, 2026
Date Decided: March 17, 2026

Thomas V. Ayala and Alyssa Radovanovich, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, DE; *Attorneys for Plaintiff/Counterclaim Defendant Cecilian Partners, Inc. and Counterclaim Defendant John D. Cecilian, Jr.*

Seth A. Niederman, FOX ROTHSCHILD LLP, Wilmington, DE; OF COUNSEL: Ryan T. Becker and Robert H. Eisentrout, FOX ROTHSCHILD LLP, Philadelphia, PA; *Attorneys for Defendants/Counterclaim Plaintiffs Company Fifteen, LLC and Daniel Webster.*

**DAVID, V.C.**

The defendants in this action purchased preferred membership units in a Pennsylvania limited liability company. The limited liability company's operating agreement prohibited dilution of the preferred membership units "to less than an aggregate 20%" interest in the company. The limited liability company later merged with a Pennsylvania corporation, after which the surviving corporation's certificate of incorporation no longer included any limitation on aggregate dilution of preferred stock. The Pennsylvania corporation subsequently redomesticated in Delaware and, like the Pennsylvania corporation's, its certificate of incorporation does not include any protection against aggregate dilution of the preferred stock.

Nevertheless, the defendants insist that their preferred shares continue to carry an anti-dilution preference. They argue that, as a matter of Pennsylvania law, their individual consent was required to eliminate their contractual rights under the predecessor limited liability company's operating agreement, and that the limited liability company's manager also signed a side letter separately granting them anti-dilution rights.

Through this action, the Delaware corporation seeks a declaratory judgment that the defendants' preferred shares do not carry anti-dilution rights. Because the defendants' arguments are premised on misunderstandings of Pennsylvania and Delaware law and a misinterpretation of the side letter at issue, summary judgment is entered for the plaintiff corporation.

1

## I.   BACKGROUND

### A.   Co15 Purchases Preferred Membership Units In The Former LLC.

In January 2019, counterclaim defendant John D. Cecilian, Jr. ("Cecilian") founded Cecilian Partners, LLC (the "Former LLC"), a Pennsylvania limited liability company that provided software for real estate developers and homebuilders.  Verified Compl. for Declaratory Relief [hereinafter Compl.] ¶¶ 12–13, Dkt. 1; Answer, Affirmative Defenses, & Am. Countercl. [hereinafter Am. Ans.] ¶¶ 12–13, Dkt. 19.  The Former LLC was governed by an operating agreement that identified Cecilian as the Former LLC's initial member and manager.  Compl., Ex. 2 [hereinafter First Restated OA] at Recitals; Ex. A to First Restated OA, Company Information Summary.

The Former LLC raised capital by issuing preferred membership units (the "Class C Preferred Units").  Compl. ¶¶ 17–18; Am. Ans. ¶¶ 17–18.  On June 7, Dr. J. Elliott Decker, the sole owner of defendant Company Fifteen, LLC ("Co15"), executed a Membership Interest Purchase Agreement ("MIPA") on behalf of Co15, under which Co15 purchased Class C Preferred Units for $50,000.  Aff. of John D. Cecilian, Jr. in Supp. of Pl. Cecilian P'rs, Inc.'s Mot. for Summ. J. [hereinafter JDC Aff.] ¶¶ 5–6, Dkt. 10; *see generally* Compl., Ex. 1 [hereinafter MIPA].  The MIPA stated that Co15, as the "Subscriber," "recognize[d] the [Former LLC] is offering up to $1,000,000 of . . . Class C [Preferred] Units (non-diluted) to accredited investors"

and, "[a]ssuming the issuance of all of the Class C [Preferred] Units being offered, the holders of Class C [Preferred] Units will own a total of 20% of the equity securities of the [Former LLC] and the remainder of the equity will be owned by the Regular Members, the Class A and Class B Members." MIPA § III(F). The MIPA did not include contractual protections preventing dilution of the Class C Preferred Units.

On July 8, the Former LLC's initial operating agreement was amended to admit additional members (the "First Restated OA"). First Restated OA at 1. Like the MIPA, the First Restated OA did not include any provisions preventing dilution of the Class C Preferred Units. *See generally id.*

On December 13, Co15 purchased additional Class C Preferred Units for $50,000. Compl. ¶ 21; Am. Ans. ¶ 21.

B. **The Former LLC's Operating Agreement Is Amended To Include An Aggregate Anti-Dilution Preference.**

On December 31, Co15 purchased more Class C Preferred Units for an additional $150,000. Compl. ¶ 21; Am. Ans. ¶ 21; JDC Aff. ¶ 5. In connection with that investment, the First Restated OA was amended (as amended, the "Second Restated OA"), including to add the following language prohibiting the dilution of the Class C Preferred Units "to less than an aggregate 20% Percentage Interest" in the Former LLC:

The Members and the Manager agree that any Interests authorized and issued after the date of this Agreement, other than Compensatory Interests ("New Interests") shall not exceed $1,000,000, and the Members shall amend and restate this Agreement or the Company Information Statement, as necessary to provide for any such New Interests and any rights, benefits and obligations thereto, including the obligation to make Capital Contributions, if any; provided, however, that *no such issuance of New Interests* or amendment to this Agreement, and, further, no issuance of Compensatory Interests, *shall dilute the Class C Preferred to less than an aggregate 20% Percentage Interest in the* [*Former LLC*] or change the Class C Preferred Return.

Compl., Ex. 3 [hereinafter Second Restated OA] § 7.8 (emphasis added); JDC Aff. ¶ 9.

### C. Cecilian And Decker Execute A Side Letter.

The same day, Cecilian and Decker executed a letter agreement (the "Side Letter") that included similar language:

Except for the Class A and Class B interests already issued, and a total of $1 million of Class C Interests, *no Compensatory Interests, New Interests or any other Interests shall be issued*, and no amendment to the Operating Agreement shall be made, *that in any way would* (i) require Decker to make any Capital Contribution beyond the initial purchase of his Class C Interests, or cause or provide for any adverse effect on Decker for any failure to make any such Capital Contribution, in each case without Decker's express written consent, which consent may be withheld in Decker's sole discretion, (ii) require Decker to lend to the [Former LLC] or make any personal guarantee, or (iii) *dilute the Class C Preferred to less than an aggregate 20% Percentage Interest in the* [*Former LLC*] or change the Class C Preferred Return.

Compl., Ex. 4 [hereinafter Side Letter] ¶ 2 (emphasis added); Am. Ans. ¶ 37; JDC Aff. ¶ 10. The Side Letter separately stated that:

4

If, after the Restricted Period,[1] Cecilian, directly or indirectly, engages in any Business Opportunity[2] or utilizes any Intellectual Property, Decker shall have the right, without paying any amount therefor, to an ownership interest therein equal to Decker's ownership interest in the [Former LLC].

Side Letter ¶ 4.

### D. Webster Purchases Preferred Membership Interests In The Former LLC.

On January 28, 2020, defendant Daniel Webster (with Co15, "Defendants") executed a MIPA under which he purchased Class C Preferred Units for $25,000. Compl. ¶ 25; *id.*, Ex. 6; Am. Ans. ¶ 25; JDC Aff. ¶ 14. Co15 also purchased additional Class C Preferred Units for another $100,000. Compl. ¶ 25; Am. Ans. ¶ 25; JDC Aff. ¶ 5. After this investment, Co15 owned interests representing 7.0% and Webster owned interests representing 0.5% of the Former LLC's equity. Compl. ¶ 25; Am. Ans. ¶ 25; JDC Aff. ¶ 15.

---

[1] The Side Letter incorporates definitions in the Second Restated OA, which defines "Restricted Period" to mean "the period when Cecilian is a Manager of the [Former LLC]." Second Restated OA § 11.2.

[2] The Second Restated OA defines "Business Opportunities" to mean:

[W]hen used with respect to Cecilian and any future Manager, all business ideas, prospects, proposals, projects or other opportunities pertaining to the Business, other than those listed in Schedule 11.2, which are (i) developed by such Person (A) during the Restricted Period, or (B) within the six-month period immediately prior to the date hereof . . . .

*Id.* § 1.6.

**E.** **The Former LLC's Operating Agreement Is Amended To Increase The Aggregate Anti-Dilution Preference Threshold.**

The Second Restated OA was amended on September 11 (as amended, the "Third Restated OA"). Compl., Ex. 8 [hereinafter Third Restated OA]. Under the Third Restated OA, Class C Preferred Units were renamed "Class A Preferred Units." Third Restated OA, Ex. A (listing Decker and Webster as "Class A Preferred" members); JDC Aff. ¶ 17. The Third Restated OA also increased the threshold under which the Class A Preferred Members could not be diluted from an aggregate 20% to 25%, providing that "no . . . issuance of New Interests or amendment to this Agreement shall dilute the Class A Preferred Members to less than an ***aggregate twenty-five percent*** (25%) Percentage Interest in the [Former LLC] . . . ." Third Restated OA § 7.7 (emphasis added).

**F.** **The Former LLC Merges Into A Pennsylvania Corporation.**

On June 30, 2021, the Former LLC merged with and into Cecilian Partners, Inc. ("Cecilian PA"), a Pennsylvania corporation (the "PA Merger"). Compl., Ex. 21 [hereinafter PA Merger Written Consent] at 1. Immediately prior to the PA Merger, the Class A Preferred Members owned, in the aggregate, 31% of the Former LLC's equity. Compl., Ex. 11 (reflecting capitalization table as of June 30, 2021); JDC Aff. ¶ 19; *see also* Compl., Ex. 15 ("Today, [the Former LLC] has 31% ownership tied-up in a non-dilutive structure."). After the PA Merger, holders of "Common Units" owned common stock and holders of Class A Preferred Units held

6

"Class A Preferred Stock," with each member of the Former LLC retaining the same percentage ownership interest owned prior to the PA Merger. *See* Compl. ¶ 77; Am. Ans. ¶ 77. Unlike the Second Restated OA and Third Restated OA, the Certificate of Incorporation of Cecilian Partners, Inc. (the "Cecilian PA COI") did not include any limitation on aggregate dilution of the Class A Preferred Stock. *See* Compl., Ex. 11 at Ex. A [hereinafter Cecilian PA COI].

On July 11, 2022, holders of 100% of Cecilian PA's common stock and 75.8% of Cecilian PA's Class A Preferred Stock executed written consents stating that "the board of directors of [Cecilian PA] ha[s] deemed it in the best interest of [Cecilian PA] to end the non-dilution feature related to the Class A Preferred S[tock]," and resolving that "the undersigned shareholders agree to end all non-dilution of the Class A Preferred S[tock] after the date hereof" (the "July 11 Written Consent"). Compl., Ex. 16 [hereinafter July 11 Written Consent]. Co15 and Webster did not sign the July 11 Written Consent. *See id.* According to Plaintiffs, the purpose of the July 11 Written Consent was to end Cecilian PA's "custom" or "continued practice" of maintaining anti-dilution, even though the Cecilian PA COI had already eliminated anti-dilution protections for the Class A Preferred Stock.[3] Omnibus

---

[3] Defendants dispute this explanation, but it is irrelevant to the Court's legal analysis herein. *See* Defs.'/Countercl. Pls.' Answering Br. Opposing Pl.'s/Countercl. Defs.' Premature Summ. J. Mots. [hereinafter DAB] at 25–27, 60–62, Dkt. 30.

Reply Br. in Further Supp. of the Mots. for Summ. J. of Pl.-Countercl. Def. Cecilian P'rs, Inc. and Countercl. Def. John D. Cecilian, Jr. [hereinafter PRB] at 26, Dkt. 32; Tr. of 2-23-2026 Oral Arg. on Pl.'s Mot. for Summ. J. [hereinafter Tr.] at 14:1–14:5, Dkt. 41 ("[T]he July 2022 shareholder consent . . . eliminated a continued practice of maintaining the aggregate percentage of the [Class] A preferred holders above 25 percent.").

### G.  Cecilian PA Redomesticates In Delaware.

On September 8, Cecilian PA's board of directors adopted a plan of domestication and conversion under which Cecilian PA changed its domicile from Pennsylvania to Delaware (the "Redomestication").  PA Merger Written Consent; Compl., Ex. 23; *id.*, Ex. 24.

On September 11, the surviving Delaware entity ("Cecilian DE," and together with Cecilian, "Plaintiffs") filed its certificate of incorporation with the Delaware Secretary of State (the "Cecilian DE COI").  Compl., Ex. 25 [hereinafter Cecilian DE COI], at 1.  Like the Cecilian PA COI, the Cecilian DE COI did not include any limitation on aggregate dilution of the Class A Preferred Stock.

### H.  Cecilian DE Issues Class B Preferred Stock To Another Investor.

One year later, on September 11, 2023, Cecilian DE filed an amended certificate of incorporation with the Delaware Secretary of State (the "Cecilian DE Amended COI"), which also did not include any limitation on aggregate dilution of

8

the Class A Preferred Stock. Compl., Ex. 28. That amendment was approved by Cecilian DE's board of directors and all Cecilian DE stockholders other than Defendants. *Id.*, Ex. 26; *id.*, Ex. 27.

The Cecilian DE Amended COI authorized the issuance of "Class B Preferred Stock" to another investor, Resolve Growth Partners I, L.P. ("Resolve"), as part of a $12.7 million equity financing. *Id.*, Ex. 26; *Id.*, Ex. 27; JDC Aff. ¶ 37. After that financing, Defendants owned approximately 2.998% of Cecilian DE's outstanding equity. *Id.*

## I. Procedural History

On May 29, 2025, Plaintiffs initiated this action through the filing of a Verified Complaint for Declaratory Relief (the "Complaint"). Dkt. 1. The Complaint seeks a declaratory judgment that "Defendants' Class A Preferred Stock does not carry any anti-dilution rights under [Cecilian DE]'s Restated Certificate of Incorporation"; "Defendants are not entitled to maintain any fixed or undilutable percentage ownership interest in [Cecilian DE]"; and "[Cecilian DE] may issue new shares and conduct equity financings without regard to any asserted anti-dilution rights associated with Defendants' [Class] A Preferred Stock." Compl. ¶ 93.

On September 25, 2025, Defendants filed an Answer, Affirmative Defenses, & Amended Counterclaim (the "Counterclaim"). Dkt. 19. The Counterclaim alleges

9

a claim for breach of the Side Letter against Cecilian DE, or in the alternative, against Cecilian personally. Am. Ans., Countercls. ¶¶ 26–42.

Plaintiffs moved for summary judgment on the Complaint's sole count for declaratory judgment and the Counterclaim's sole count for breach of the Side Letter (the "Motion for Summary Judgment").[4] Briefing on the Motion for Summary Judgment concluded on November 14, 2025.[5] The Court heard oral argument on February 23, 2026.

## II. ANALYSIS

The Court will enter summary judgment where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "[T]he facts must be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that there is no material question of fact." *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldg. Co.*, 853 A.2d 124, 126 (Del. Ch. 2004).

---

[4] Cecilian DE moved for summary judgment on its claim in the Complaint on September 5. Pl. Cecilian P'rs, Inc.'s Mot. for Summ. J., Dkt. 10. Cecilian DE and Cecilian subsequently moved for summary judgment on the Counterclaim as well. Countercl. Def. John D. Cecilian, Jr.'s Mot. for Summ. J., Dkt. 23; Cecilian P'rs, Inc.'s Joinder in the Mot. for Summ. J. Filed by Countercl. Def. John D. Cecilian, Jr., Dkt. 24.

[5] *See* Opening Br. in Supp. of Pl. Cecilian P'rs, Inc.'s Mot. for Summ. J. [hereinafter POB], Dkt. 10; DAB; PRB.

Although Defendants complain that the Motion for Summary Judgment is premature because the parties have not yet engaged in discovery, summary judgment is appropriate "where the issue is the construction of a legal document such as a certificate of incorporation." *Smith v. Nu-West Indus., Inc.*, 2000 WL 1641248, at *2 (Del. Ch. Oct. 25, 2000). Summary judgment is also well-suited to resolving "a dispute over an unambiguous contract 'because there is no need to resolve material disputes of fact.'" *XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1124 (Del. Ch. 2007) (quoting *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

### A. Plaintiffs Are Entitled To Summary Judgment On The Complaint's Request For A Declaratory Judgment.

In the sole count of their Complaint, Plaintiffs seek a declaration that Defendants, as owners of Class A Preferred Stock, do not hold a contractual preference entitling them to an "undilutable" percentage ownership interest in Cecilian DE (an "Anti-Dilution Preference").

Section 151(a) of the Delaware General Corporation Law ("DGCL") requires that "designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof[] . . . shall be stated and expressed in the certificate of incorporation or of any amendment thereto." 8 *Del. C.* § 151(a). Thus, an anti-dilution "preference must derive from the provisions of the certificate of incorporation that created those preferential rights." *Alta Berkeley*

11

*VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (citing 8 *Del. C.* § 151(a)); *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 853 n.46 (Del. 1998) ("Stock preferences must . . . be clearly expressed and will not be presumed.") (citation omitted). "Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute." *Elliott Assocs.*, 715 A.2d at 852. Additionally, under Section 102(b)(3) of the DGCL, "[n]o stockholder shall have any preemptive right to subscribe to an additional issue of stock or to any security convertible into such stock unless, and except to the extent that, such right is expressly granted to such stockholder in the certificate of incorporation." 8 *Del. C.* § 102(b)(3). It is undisputed that the operative certificate of incorporation—the Cecilian DE Amended COI—does not express an Anti-Dilution Preference for the Class A Preferred Stock. The analysis should end here.

Nevertheless, Defendants claim entitlement to an Anti-Dilution Preference based on the Former LLC's Second Restated OA. Their argument is a long walk. Defendants say that under Pennsylvania law, a preference in an entity's governing documents cannot be modified or eliminated without each holder's consent. On that premise, Defendants argue that each governing document adopted after the Second Restated OA—including the Third Restated OA (which modified an aggregate dilution threshold) and the Cecilian PA COI, Cecilian DE COI, and Cecilian DE

12

Amended COI (none of which included an Anti-Dilution Preference)—was invalid to the extent it purported to modify or eliminate Defendants' Anti-Dilution Preference in the Second Restated OA. Further, Defendants contend that because their Anti-Dilution Preference survived at the time of the Redomestication, it "remain[s] attached" to Cecilian DE as a debt, liability, or duty under 8 *Del. C.* § 265(f).

Defendants' position fails as a matter of law. First, Defendants misconstrue Pennsylvania law, which did not require Defendants' consent to eliminate an Anti-Dilution Preference by merger. Second, even if an Anti-Dilution Preference existed at the time of the Redomestication (and it did not), the Anti-Dilution Preference was not a debt, liability, or duty that "remain[ed] attached to the corporation."

### 1. Defendants' Arguments Under Pennsylvania Law Fail.

Defendants misconstrue Pennsylvania law, which permits the modification or elimination of a preference through merger, even in the absence of each holder's consent.

Defendants rely on two Pennsylvania state court decisions from the 1950s—*Bechtold v. Coleman Realty Co.*, 79 A.2d 661 (Pa. 1951), and *Schaad v. Hotel Easton Co.*, 87 A.2d 227 (Pa. 1952)—to argue that under Pennsylvania law, changing or eliminating "property and contractual rights" created through an entity's governing documents requires the "individual consent" of each preferred stockholder affected.

13

DAB at 44; *see also id.* at 26 ("Under Pennsylvania law, Movants could not take away the Shareholders' property rights without their consent—regardless of whether they did not include such rights on the face of the PA Corporation's governing documents.").

In *Bechtold*, the Pennsylvania Supreme Court invalidated a stockholder vote amending the bylaws of a Pennsylvania corporation to eliminate restrictions on the transfer of the corporation's stock. 79 A.2d at 663. The Pennsylvania Supreme Court reasoned that the transfer restrictions in the corporation's bylaws were "designed to vest property rights inter se among all stockholders" and therefore could not "be repealed or changed without the consent of the other parties whose rights are affected." *Id.*

The following year, the Pennsylvania Supreme Court relied on *Bechtold* to decide *Schaad*, an action invalidating a recapitalization plan through which a corporation's governing documents were amended to eliminate the preferred stockholders' right to receive dividends. Relying on *Bechtold*, the *Schaad* court held that:

> [A] general reservation of the power to amend the by-laws of a corporation cannot be construed as permitting the abrogation of substantial rights of property of the shareholders or the alteration of their contractual relations inter se, but only the changing of regulations governing the administration and conduct of the corporation's internal affairs; provisions affecting property or contractual rights cannot be repealed or altered without the consent of the parties whose interests are thereby impaired. No amendment of defendant's by-laws,

14

therefore, could legally change the preferential rights accorded to the preferred stock unless the holder of the stock assented thereto.

87 A.2d at 230. Defendants interpret *Bechtold* and *Schaad* to prohibit modification or elimination of an Anti-Dilution Preference without Defendants' consent. According to Defendants, "[b]ecause the Shareholders' perpetual non-dilution rights are property rights created under Pennsylvania law, they cannot be taken away without their consent—no matter how many votes or business form changes the Corporation undergoes." DAB at 45.

Half a century after *Bechtold* and *Schaad* were decided, however, the Pennsylvania Supreme Court affirmed *Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740 (Pa. Super. Ct. 2000), *aff'd*, 801 A.2d 1212 (Pa. 2002), a decision upholding a merger that had the effect of eliminating transfer restrictions in a corporation's governing documents without the consent of all stockholders. The *Seven Springs* court held that a merger "legally moots the terms of a restriction on transfer of the stock of a disappearing corporation," distinguishing *Bechtold* on the basis that the transfer restrictions were eliminated by operation of merger rather than through amendment to the corporation's bylaws.[6] *Id.* at 748.

---

[6] In 2013, Pennsylvania's corporation law statute was amended to provide that "[a] restriction may be amended in the manner provided in the bylaws or agreement for amending the restriction or, in the absence of such a provision, as provided for amending

15

By the same logic, here, the Anti-Dilution Preference was eliminated in the PA Merger. That merger was approved by the Former LLC's manager and the holders of a majority of the Former LLC's interests—and also ratified by a supermajority of the Class A Preferred Stockholders—consistent with Pennsylvania statutory authority and the Third Restated OA in effect at the time of the merger.[7] Under Pennsylvania law, the PA Merger "legally mooted" the "terms" of the membership interests in the Former LLC, including the Anti-Dilution Preference.[8]

---

the bylaws or agreement generally[,]" thereby "reject[ing] the holding in *Bechtold v. Coleman Realty Co.*, 367 Pa. 208, 79 A.2d 661 (1951)." 15 *Pa. C.S.A.* § 1529(b) and Comm. Cmt. 2022. Defendants contend that this amendment applies only to transfer restrictions and not other stockholder preferences, but I need not resolve that issue because *Seven Springs* makes clear that, even before the amendment, *Bechtold* did not apply to mergers.

[7] PA Merger Written Consent at 1; *see* 15 *Pa. C.S.A.* § 325(c) ("Except as provided in the organic rules, [a plan] shall be adopted upon receiving a majority of the votes cast by all members, if any, entitled to vote thereon of each of the domestic limited liability companies that is a party to the transaction under the plan and, if any class of members is entitled to vote thereon as a class, a majority of the votes cast in each class vote."); POB at 26–27 ("Although the Third Restated OA did not expressly confer member voting rights on a merger the transaction was approved by [Cecilian] and Philip Worland as common members holding a majority of the Former LLC's interests, and it was subsequently ratified by a supermajority of the Class A Preferred stockholders and of all stockholders generally.").

[8] Defendants appear to argue that because other holders of Class A Preferred Stock consented to the PA Merger while Defendants did not, Defendants thereafter held a unique, "implied" class of stock with an Anti-Dilution Preference. *See* DAB at 41 n.10. Defendants cite no authority in support of this novel proposition, which conflicts with the DGCL. *See* 8 *Del. C.* § 102(a)(4) ("If the corporation is to be authorized to issue more than 1 class of stock, *the certificate of incorporation shall set forth* the total number of shares of *all classes of stock* which the corporation shall have authority to issue and the

16

*Id.*; *see also* 15 *Pa. C.S.A.* § 336(a)(10) (explaining that when a merger becomes effective, "[t]he interests in each merging association . . . are converted or canceled, and the interest holders of those interests are entitled only to the rights provided to them under the plan . . . ."). Defendants also accepted Cecilian PA stock certificates incorporating the Cecilian PA COI, which did not include the Anti-Dilution Preference. Compl., Ex. 13; *id.*, Ex. 14; Am. Ans. ¶ 61; *see* 15 *Pa. C.S.A.* § 1530, Comm. Cmt. 1992 (describing Pennsylvania's adoption of the "straight-forward Delaware solution to the effect that no preemptive rights exist apart from those created by contract in the articles themselves").

Because the PA Merger eliminated the Anti-Dilution Preference, Plaintiffs are entitled to summary judgment on Count I of the Complaint.

### 2. The Anti-Dilution Preference Is Not A Debt, Liability, Or Duty Under Section 265(f).

Assuming the Anti-Dilution Preference survived at the time of the Redomestication (and, as explained above, it did not), Defendants contend that Section 265(f) of the DGCL preserved the preference even though it was not included in the Cecilian DE COI (and likewise does not appear in the Cecilian DE Amended COI). This argument independently fails.

---

number of shares of each class and shall specify each class the shares of which are to be without par value and each class the shares of which are to have par value and the par value of the shares of each such class.") (emphasis added).

17

Section 265(f) provides in full:

> When an other entity has been converted to a corporation of this State pursuant to this section, the corporation of this State shall, for all purposes of the laws of the State of Delaware, be deemed to be the same entity as the converting other entity. When any conversion shall have become effective under this section, for all purposes of the laws of the State of Delaware, all of the rights, privileges and powers of the other entity that has converted, and all property, real, personal and mixed, and all debts due to such other entity, as well as all other things and causes of action belonging to such other entity, shall remain vested in the domestic corporation to which such other entity has converted and shall be the property of such domestic corporation and the title to any real property vested by deed or otherwise in such other entity shall not revert or be in any way impaired by reason of this chapter; but ***all rights of creditors and all liens upon any property of such other entity shall be preserved unimpaired, and all debts, liabilities and duties of the other entity that has converted shall remain attached to the corporation of this State*** to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a corporation of this State. The rights, privileges, powers and interests in property of the other entity, as well as the debts, liabilities and duties of the other entity, shall not be deemed, as a consequence of the conversion, to have been transferred to the domestic corporation to which such other entity has converted for any purpose of the laws of the State of Delaware.

8 *Del. C.* § 265(f) (emphasis added). Defendants argue that an Anti-Dilution Preference is a debt, liability, or duty of Cecilian PA and therefore "remain[ed] attached" to Cecilian DE. *Id.*; DAB at 42–43.

In *Federal United Corp. v. Havender*, 11 A.2d 331 (Del. 1940), the Delaware Supreme Court considered and rejected a similar argument. Interpreting nearly

18

identical language in Section 259(a),[9] the Delaware Supreme Court held that "[a] holder of preference shares" is not a creditor or lienholder, and "debts, liabilities and duties" do not include "the results of the contractual relation arising out of stock ownership either as between the shareholders inter sese, or as between the shareholder and the corporation," explaining:

> A holder of preference shares as to which dividends have accumulated through time is not a creditor of the corporation in the ordinary and usual meaning of the word; nor is he the holder of a lien as that word is usually understood. In proximate contextual relation to the words, 'creditors' and 'liens', are the words, 'debts', 'liabilities' and 'duties'. The connotation of these words, having in mind the significant fact that there is nothing in the section that purports to deal with the rights of shareholders, leads to the conclusion that the words and terms were not intended to refer or to be applicable to the results of the contractual relation arising out of stock ownership either as between the shareholders inter sese, or as between the shareholder and the corporation. ***The words and terms are readily to be understood as***

---

[9] *Compare* 8 *Del. C.* § 259(a):

> [B]ut all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

*with* 8 *Del. C.* § 265(f):

> [B]ut all rights of creditors and all liens upon any property of such other entity shall be preserved unimpaired, and all debts, liabilities and duties of the other entity that has converted shall remain attached to the corporation of this State to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a corporation of this State.

19

*referable to persons external to the corporation, and to debts, liabilities and duties due from the corporation to them, and not to those internal liabilities and duties of the corporation to the shareholder which spring from that relationship*.

*Havender*, 11 A.2d at 335–36 (emphasis added). Under *Havender*, the Anti-Dilution Preference (had one existed at the time of the Redomestication) was not a debt, liability, or duty—but a "result[] of the contractual relation arising out of [the] stock." 11 A.2d at 336.

### 3. Defendants Have Not Identified Any Material Disputes Of Fact That Preclude Summary Judgment.

To avoid summary judgment, Defendants attempt to identify factual disputes concerning the Anti-Dilution Preference. Each of these purported fact issues is immaterial.

First, Defendants point to a purported dispute concerning "[w]hich documents the Shareholders relied on when investing in the Former LLC." DAB at 21. That issue has no bearing on whether an Anti-Dilution Preference was eliminated by merger.

Similarly, Defendants contend that the nature of Cecilian PA's "agreement" and "custom" of maintaining anti-dilution presents a material issue of fact. *Id.* at 22. Again, that issue has no bearing on the effect of the PA Merger on the Anti-Dilution Preference.

20

Relatedly, Defendants assert that Cecilian "believed that non-dilution rights survived the merger despite the PA Corporation's facially neutral governing documents." *Id.* at 26. Even if that were true, Cecilian's incorrect belief about the legal effect of the PA Merger would not change the outcome.

Finally, Defendants argue that prior to the PA Merger, Cecilian represented that the entity would undergo a "statutory conversion," but fail to explain the legal relevance of this purported fact. *See id.* at 21, 57. Importantly, Defendants do not allege that the PA Merger was the product of a breach of fiduciary duty or invalid for any reason other than it eliminated the Anti-Dilution Preference.

Thus, Defendants fail to identify any dispute of material fact that could preclude entry of summary judgment.[10]

## B. Plaintiffs Are Entitled To Summary Judgment On Defendants' Counterclaim For Breach Of The Side Letter.

In the sole count of their Counterclaim, Defendants[11] allege that Plaintiffs breached the Side Letter "by issuing shares to Resolve, thereby diluting

---

[10] Plaintiffs also argue that Defendants' affirmative defenses of unclean hands and failure to join all necessary parties fail as a matter of law. POB at 46, 48. Because Defendants did not brief these defenses, they are waived. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[11] Although the Counterclaim is brought on behalf of both Defendants, Webster is not a party to the Side Letter, nor do Plaintiffs contend that Webster is a third-party beneficiary under the contract. Thus, as it relates to Webster, the Counterclaim must be dismissed with judgment entered in Plaintiffs' favor.

[Defendants'] ownership in violation of paragraph 2 of the Side Letter[,]" and by "refus[ing] to gross [Co15] back to the 7.0% ownership interest it is entitled to under the Side Letter or the .5% Webster is entitled to own." Am. Ans., Countercls. ¶¶ 29–30.

"Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

In the first instance, the parties appear to agree that it is unclear from the face of the Side Letter whether Cecilian intended to bind the Former LLC to that agreement. *See* POB at 22 n.49 ("[T]he document is unclear as to whether [Cecilian] [signed it] in his personal capacity or as the then-sole manager of the Former LLC."); DAB at 29 ("Whether the Corporation is also bound by the Side Letter or whether it encompasses Webster are genuine issues of material fact . . . ."). Plaintiffs submit, however, that even if the Side Letter bound the Former LLC, that entity no longer exists, and the Side Letter cannot bind Cecilian DE without approval of the corporation's board of directors. As the Delaware Supreme Court held in *Grimes v. Alteon, Inc.*, 804 A.2d 256 (Del. 2002), the board of directors has the "exclusive authority to issue stock and regulate a corporation's capital structure," such that an

officer cannot make "commitments regarding the issuance of stock" without "approv[al] in writing by the board of directors." *Id.* at 258, 261.

I need not decide whether the Side Letter binds the corporation, however, because even if it does, the Counterclaim fails for a separate reason. Namely, Defendants have not alleged a breach based on a reasonable interpretation of the Side Letter.

When a motion for summary judgment "involves interpretation of a contract, 'summary judgment is appropriate only if the contract in question is unambiguous.'" *Fletcher Intern., Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *3 (Del. Ch. May 28, 2010) (quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007)). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Yatra Online, Inc. v. Ebix, Inc.*, 2021 WL 3855514, at *7 (Del. Ch. Aug. 30, 2021) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

Defendants allege breaches of Paragraphs 2 and 4 of the Side Letter. Paragraph 2 states:

> Except for the Class A and Class B interests already issued, and a total of $1 million of Class C Interests, *no Compensatory Interests, New Interests or any other Interests shall be issued*, and no amendment to the Operating Agreement shall be made, *that in any way would* (i) require Decker to make any Capital Contribution beyond the initial purchase of his Class C Interests, or cause or provide for any adverse

> effect on Decker for any failure to make any such Capital Contribution, in each case without Decker's express written consent, which consent may be withheld in Decker's sole discretion, (ii) require Decker to lend to the [Former LLC] or make any personal guarantee, or (iii) ***dilute the Class C Preferred to less than an aggregate 20% Percentage Interest in the*** [***Former LLC***] or change the Class C Preferred Return.

Side Letter ¶ 2. Defendants interpret Paragraph 2 to mean that Cecilian "agreed to not issue ownership interests or amend the Former LLC's operating agreement in a way that would adversely affect [Co15] without its written consent." DAB at 10. But Paragraph 2, by its plain language, does not "guarantee[] [Co15]'s 7.0% ownership interest in the Corporation[,]" as Defendants argue. DAB at 28. Instead, Paragraph 2 unambiguously states that no interests shall be issued, and the Second Restated OA will not be amended, in a way that would (1) require a capital contribution—which did not occur; (2) require a personal guarantee—which did not occur; or (3) dilute the Class C Preferred Units to less than an *aggregate* 20% interest. Defendants do not allege or argue that Plaintiffs breached the Side Letter because the Class A Preferred Stock, as the successor to the Class C Preferred Units, was diluted below an *aggregate* 20% interest. *See Aggregate*, *Black's Law Dictionary* (12th ed. 2024) (defining "[a]ggregate" to mean "[f]ormed by combining into a single whole or total"). Rather, they assert breach based on dilution of Co15's

24

7% interest *individually*.[12] The plain language of Paragraph 2 does not support that claim.[13]

> Additionally, Paragraph 4 of the Side Letter states:
>
> If, after the Restricted Period, Cecilian, directly or indirectly, engages in any Business Opportunity or utilizes any Intellectual Property, Decker shall have the right, without paying any amount therefor, to an ownership interest therein equal to Decker's ownership interest in the [Former LLC].

Side Letter ¶ 4. Defendants argue that this provision means Plaintiffs "personally agreed to sustain [Co15]'s ownership interest without [Co15] needing to invest more money." DAB at 8. To arrive at this conclusion, Defendants assert that Cecilian DE is a Business Opportunity (a business idea pertaining to the Former LLC's Business) arising after the Restricted Period (when Cecilian was the Manager of the Former LLC), entitling Decker to an ownership interest in Cecilian DE "equal to Decker's ownership interest in" the Former LLC. Even assuming Cecilian DE is a "Business

---

[12] *See* Tr. at 41:18–20 ("We are arguing that . . . the violation . . . occurred when our individual 7.5 percent was diluted."); *see also* DAB at 29 ("[Cecilian] breached the Side Letter by failing to keep Company Fifteen's ownership at 7.0% in the Corporation today."). Additionally, the Former LLC never diluted the Class C Preferred Units. No dilution (individual or aggregate) occurred until after Cecilian PA was converted to *Cecilian DE* and issuance of the Class B Preferred Stock diluted the *Class A* Preferred Stock.

[13] Notably, while Defendants argue that parallel language in the Second Restated OA is ambiguous based on the interplay of Section 7.8 and Section 18, the Side Letter does not include these additional provisions. *See* DAB at 48–51.

Opportunity,"[14] Paragraph 4 merely required Cecilian to honor Decker's equity interest to the extent the business continued on in another form. This is precisely what occurred through the PA Merger and later in the Redomestication; in each case, Co15 retained an interest in the surviving entity at the level held in its predecessor. Nothing in the plain language of the Side Letter supports Defendants' position that, beyond this, Paragraph 4 "guarantee[d] [Co15] a *perpetual non-dilutable* 7.0% ownership interest in the Corporation." DAB at 28 (emphasis added).

Policy considerations described in *Grimes* underscore the unreasonableness of Defendants' position on both Paragraphs 2 and 4 of the Side Letter. Addressing an alleged "agreement [that] purport[ed] to bind the corporation to issue to [the stockholder plaintiff] 10% of a future issuance of stock[,]" the *Grimes* court emphasized that a "fundamental polic[y] of the Corporation Law" is "to ensure certainty in the instruments upon which the corporation's capital structure is based."

---

[14] As Plaintiffs point out, however, "Business Opportunities" under the Former LLC's operating agreements are opportunities that Cecilian pursues "without presenting them to or including the Former LLC." PRB at 13 (emphasis omitted). The PA Merger was the Former LLC's "own transaction," *id.* at 14, and under Section 265(f), "[w]hen an other entity has been converted to a corporation of this State . . . [it] shall . . . be deemed to be the same entity as the converting other entity." 8 *Del. C.* § 265(f); PRB at 14. In addition, Plaintiffs argue that the obligation to present Business Opportunities to the Former LLC has ceased because the Former LLC was eliminated by the PA Merger. Answer and Affirmative Defenses of Countercl. Defs. Cecilian P'rs, Inc. and John D. Cecilian, Jr., to Company Fifteen's and Webster's Am. Countercl. at 22, Dkt. 22 ("A non-existing entity has no business opportunities."); *see* PRB at 14.

*Grimes*, 804 A.2d at 260. "[I]ssuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise[,]" and "[t]he law properly requires certainty in such matters." *Id.* It is therefore particularly unreasonable to infer from the Side Letter a perpetual anti-dilution right that is neither included in the corporation's certificate of incorporation nor clearly expressed in the plain language of the contract.

Because Co15's arguments fail on the plain language of the Side Letter, I do not reach the question of whether Co15's purported anti-dilution right, if the contract included one, would be invalid as a matter of statutory law, as the Delaware Supreme Court concluded of the oral contract at issue in *Grimes*. On the current record, it is unclear whether Cecilian executed the Side Letter on behalf of the Former LLC,[15] whether he was authorized to do so, whether Pennsylvania law permits such a contract, and (assuming those questions are answered in the affirmative) whether the Side Letter should continue to bind Cecilian DE after the PA Merger and the Redomestication. I need not resolve any of those issues because, as explained above,

---

[15] *See supra* pp. 22–23.

27

even assuming the Side Letter is valid, Co15 nonetheless failed to identify a breach based on a reasonable interpretation of the unambiguous language of that contract.[16]

Because Defendants fail to identify a breach of the Side Letter, Plaintiffs are entitled to summary judgment on the Counterclaim.

## III.  CONCLUSION

For the reasons explained above, Plaintiffs' Motion for Summary Judgment is GRANTED.  The parties are directed to meet and confer on a proposed form of order to implement the rulings herein.

---

[16] *See Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2025 WL 3537343, at *14 n.76 (Del. Dec. 10, 2025) (TABLE) ("[I]f it is not necessary to decide more, it is necessary not to decide more . . . .") (citation omitted).